**Opinion filed November 14, 2025**



## In The

# Eleventh Court of Appeals

_____

## No. 11-24-00059-CR

_____

## GREGORY FRANK ESTES, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 24103-B**

## M E M O R A N D U M   O P I N I O N

Appellant, Gregory Frank Estes, was charged with seven counts of aggravated sexual assault of a child, a first-degree felony (Counts One through Seven); one count of sexual assault of a child, a second-degree felony (Count Eight); and two counts of indecency with a child by sexual contact, a second-degree felony (Counts Nine and Ten). *See* TEX. PENAL CODE ANN. § 22.021(a), (e) (West 2019), § 22.011(a), (f) (West Supp. 2024), § 21.11(a), (d) (West 2019). At trial, the State

proceeded on eight of the ten counts,[1] and the jury convicted Appellant on Counts One and Five, which alleged digital penetration, but acquitted him on the remaining counts. The jury assessed his punishment at ten years' imprisonment for Counts One and Five. The trial court sentenced Appellant accordingly and ordered the sentences to run consecutively.

In six issues, Appellant challenges his convictions, arguing that the trial court abused its discretion in: (1) admitting extraneous-offense evidence involving six different women; (2) determining that the complainant's therapist was qualified as a trauma expert; (3) determining that the case detective was qualified as a delayed outcry expert; (4) excluding evidence that a grand jury had previously no-billed the complainant's allegations against Appellant; (5) excluding evidence during the punishment phase; and (6) denying Appellant's motion for new trial based on newly discovered evidence. We affirm in part and vacate and dismiss in part.

## I. *General Background*

The complainant, PSEUJKR,[2] is Appellant's great niece. Thirty years old at trial, PSEUJKR testified that Appellant sexually abused her from the age of eight or nine to the age of seventeen, recounting four specific incidents in her testimony.

PSEUJKR testified that the first incident (Counts One through Three and Nine) occurred at her great-grandparents' home on or about November 22, 2001, when she was approximately nine years old. During this incident, Appellant entered the bathroom while PSEUJKR was getting ready to change into "[a] bathing suit" and touched her vagina, penetrated her vagina with his fingers, made her touch his

---

[1]Counts Eight and Ten were waived by the State before the jury was empaneled and sworn.

[2]To protect the identity of the complainant, we refer to her by the pseudonym given in the indictment and refer to family members of the complainant, as well as the extraneous-offense witnesses, by their initials. *See* TEX. CONST. art. I, § 30(a)(1) (West 2022) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); *see generally* TEX. R. APP. P. 9.8 cmt. ("The rule does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases.").

penis, and "had [her] perform oral sex on him." Appellant then grabbed a nearby hairbrush and inserted the handle into her vagina. Afterwards, Appellant told her that if she said anything, she would get in trouble and would not "be able to be with [her] mom anymore."

When PSEUJKR was nine or ten years old and on a family trip to Ruidoso, New Mexico, sometime between 2001 and 2003, Appellant again entered uninvited when she was in the bathroom. PSEUJKR testified that she was about to shower and was wearing only her underwear when Appellant rubbed his body against hers before touching her vagina and telling her that "he could make [her] wet." Afterwards, Appellant "rubbed" his penis "on the outside of [her] vagina" and then inserted his penis into her mouth.

On or about December 1, 2003 (Counts Four through Seven), at another family event held at her great-grandparents' house, Appellant entered the bathroom while she was "on the toilet." PSEUJKR testified that Appellant digitally and orally penetrated her vagina, again made a comment as to "making [her] wet" and made her perform "the same acts on him" as before.

PSEUJKR testified that the last incident occurred when PSEUJKR was seventeen during Thanksgiving of 2010 (Counts Eight and Ten). Appellant followed her into the kitchen, "pushed his body into [hers]" with enough force that she could feel his erection against her, and touched her breast under her clothing. Appellant then stuck his hand down her pants and ask her if she was "wet." After she did not respond, he put $200 in her waistband and left the room.

Two years later, PSEUJKR reported being sexually abused by Appellant. PSEUJKR testified that she had not outcried sooner because she did not feel that anyone would believe her, in part because she had wrongfully accused her former stepfather of sexual abuse after being caught "acting out sexually" with one of her

siblings and being caught propositioning another student at school when she was "11 or 12."

Detective Frank Shoemaker, with the Abilene Police Department Special Victims Unit, investigated the case and interviewed Appellant, PSEUJKR, and PSEUJKR's mother (S.Y.). The case was referred to the district attorney's office, but it was no-billed by a grand jury in 2012.

In 2020, allegations surfaced involving Appellant and other women, which prompted Texas Ranger Josh Burson to reopen the investigation into PSEUJKR's allegations. In an interview with Ranger Burson, Appellant admitted to having sexually abused S.Y., when she was a child—something he had denied when previously questioned by Detective Shoemaker in 2012. Ranger Burson testified that Appellant stated it was "the one real thing that he did wrong in his life, and it was past the statute of limitations." While talking with Ranger Burson, Appellant also admitted to minimized versions of his conduct involving other women who later testified as rebuttal witnesses at trial: M.R.F. and C.S.

## II. *Extraneous Offenses*

In his first issue, Appellant argues that "the extraneous offense evidence introduced by the State failed to meet the standards for admissibility under Rule 404(b) because it lacked logical relevance beyond suggesting character conformity." Appellant additionally avers that even if the extraneous-offense evidence was relevant, "it should have been excluded under Rule 403 due to its highly prejudicial impact, which far outweighed any minimal probative value." TEX. R. EVID. 403, 404(b).

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). We will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001).

4

We will uphold a trial court's evidentiary ruling on appeal if it is correct on any theory of law that finds support in the record. *Gonzalez v. State*, 195 S.W.3d 114, 125–26 (Tex. Crim. App. 2006); *Dering v. State*, 465 S.W.3d 668, 670 (Tex. App.— Eastland 2015, no pet.).

To be admissible at trial, evidence must be relevant. TEX. R. EVID. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401; *Bluntson v. State*, No. AP-77,067, 2025 WL 1322702, at \*7 (Tex. Crim. App. May 7, 2025). "Evidence need not prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence." *Bluntson*, 2025 WL 1322702, at \*7 (first citing *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018); and then quoting *Henley v. State*, 493 S.W.3d 77, 84 (Tex. Crim. App. 2016) ("Relevancy is defined to be that which conduces to the proof of a pertinent hypothesis—a pertinent hypothesis being one which, if sustained would logically influence the issue.")).

A. *Relevant Background*

In the opening statement of Appellant's trial counsel, he asserted that the evidence would show PSEUJKR to be untrustworthy and "not credible," with a "history of making false allegations." PSEUJKR's lack of credibility remained the focal point throughout Appellant's cross-examination of the State's witnesses. After the State rested, Appellant called several family members to testify regarding PSEUJKR's reputation for dishonesty. Several defense witnesses testified to Appellant's "good" character, including Appellant's stepson and stepdaughter.

The State requested a hearing outside the jury's presence after the defense rested, arguing that it should be permitted to present evidence of extraneous offenses in rebuttal under the doctrine of chances and to rebut the defensive theory of

fabrication raised by PSEUJKR. Appellant argued that his defense was that he "was not there at the time that [PSEUJKR] was there," and the extraneous offenses were too dissimilar and remote in time to be admissible. Following the hearing, the trial court ruled that the extraneous acts would be admissible for showing Appellant's modus operandi and to "rebut the defensive theories of lack of opportunity, impossibility, and inappropriate motive to testify." We summarize the testimony of the extraneous-offense witnesses below.

S.Y. testified that in 1983 or 1984, when she was eight or nine years old, Appellant digitally penetrated her while she was seated on his lap in the backseat of a vehicle with family members present.[3] When S.Y. was twelve, her family and Appellant were members of the same church. Her family lived in the church and Appellant lived behind the church. While she was spending the night at Appellant's home, Appellant took her into his bedroom and engaged in digital and penile penetration. S.Y. testified that it had not been an isolated incident, and penile to vaginal penetration occurred again on the same night and the subsequent evening. Penile to vaginal penetration occurred once more in Appellant's vehicle when he was giving her a ride home after she babysat his children.

C.M., fifty-three years old at trial, testified that in 1984, when she was fourteen years old, Appellant told her he "want[ed] to show [her] some things to help protect [her]." At the time, Appellant was the principal at the private Christian school where C.M. attended. C.M. testified that Appellant asked her to join him inside one of the Sunday school classrooms, shut the door behind her, and "rub[bed] up and down on [her]" with his erection. Afterwards, Appellant told her, "You're going to be okay. We don't need to tell anybody about this. You can go now."

---

[3]S.Y. testified during the State's case-in-chief. The trial court held a pretrial hearing regarding the extraneous offense testimony of S.Y. and ruled that it was admissible. The State offered the testimony of the remaining extraneous-offense witnesses in rebuttal.

D.M., fifty-seven years old at trial, testified that in 1985, she was nineteen years old when Appellant, her brother-in-law at the time, picked her up from the airport. Appellant arrived in the church van and "drove around to the back side of the airport," where he parked, blocked her in the backseat, and began having an "inappropriate conversation about him and his own wife" and "their sex life." With D.M. telling him to stop, Appellant then engaged in nonconsensual penile to vaginal penetration while using sexually explicit language that his wife "likes it when [he does] this" and his wife "has an orgasm every time [they] have sex."

T.D., forty-eight years old at trial, testified that Appellant was once married to her sister. T.D. testified that the first incident occurred when she was twelve years old and over at Appellant's home babysitting in 1987. According to T.D., Appellant joined her on the couch and began talking about "pressure points" on the body and "cupp[ed]" his hand under her armpit and in between her legs but stopped short of touching her breasts or genitals. Then, in 1991, when T.D. was sixteen years old, she slept over at Appellant's home while attending a church event and was awakened by Appellant, who was sitting on her bed, breathing heavily. Appellant stroked her hair and told her she was pretty and how "he wished he would have waited for [her]" instead of her sister. The next day, T.D. was in the kitchen with Appellant when he noted her nipples were showing through her shirt. Appellant picked her up and pulled her body to him and pressed his erection against her body.

C.S., thirty-one years old at trial, testified that she met Appellant through the church in January 2017 while Appellant was in leadership there and she was stationed in San Angelo. C.S. testified that she considered Appellant to be a parental figure. C.S., who was in the military at the time, was stationed out-of-state after June 2017. In 2019, then twenty-seven years old, C.S. returned to attend a wedding and stayed at Appellant's home. C.S. testified to three incidents that occurred during her visit, two of which involved Appellant entering her bedroom uninvited. The first

7

time, Appellant sat on her bed and rubbed her knee while discussing her transition from active-duty military. The second time, Appellant greeted her with a hug and a kiss on the cheek and then he pulled her back in and kissed her on the lips. The third time, Appellant came into her bedroom while C.S. was trying to sleep and began massaging her lower back moving her pajama pants down lower and lower until C.S. moved to the center of the bed and gathered the blankets and pillow around her. C.S. testified that Appellant massaged her underneath her clothing, including the side of her breast until she said, "That's my stuff" and then she got up out of the bed facing away from Appellant. Appellant then came up behind her and "put his hand around [her]." She moved away and confronted him about having kissed her on the lips previously telling him that she "only kiss[ed] people on the lips [when she was] in an intimate relationship with them." She did so because she "felt uncomfortable, and there were multiple things that -- red flags that were going off in [her] head at this point."[4]

M.R.F., thirty-two years old at trial, testified that she had also met Appellant through church. In 2020, Appellant drove with M.R.F., then twenty-eight years old, to Abilene to find a new vehicle after her vehicle was damaged in a hailstorm. M.R.F. recalled Appellant making "odd" comments during the drive, including "how people should be able to get away with things without having consequences." Appellant's comments became more sexually explicit, with Appellant hypothesizing about the appearance of M.R.F.'s genitals and offering to give M.R.F. "an orgasm that would make [her] feel paralyzed." As M.R.F. attempted to drive, Appellant rubbed her lower back and briefly touched her breast and genitals. M.R.F. testified

---

[4]While talking with Ranger Burson, Appellant also admitted to minimized versions of his conduct: Appellant confessed to an incident with C.S. to his wife. He admitted to being "too affectionate;" that while massaging her he "got too close" and that "he had no intention of touching [her] breast."

8

that she pushed him away at each advance, and in the end, Appellant asked her not to say anything because it would "destroy [his] life" if she did.[5]

Appellant did not request an instruction during or immediately following S.Y.'s testimony. For the remaining five extraneous-offense witnesses, the trial court provided the following oral instruction after each testified:

> Ladies and gentlemen of the jury, the State has just offered evidence that the defendant may have committed wrongful acts that are not charged in the indictment. The State is offering this evidence to prove the defendant's modus operandi, that is, method of operating, and to rebut defensive theories of lack of opportunity or impossibility, as well as the alleged victim's inappropriate motive to testify.
>
> You are not to consider this evidence at all unless you find, beyond a reasonable doubt, that the defendant did, in fact, commit the wrongful acts. Those of you who believe the defendant did the wrongful act may consider it. Even if you do find that the defendant committed the wrongful acts, the -- you may consider this evidence only for the purpose I have described -- the limited purpose I have described.
>
> You may not consider this evidence to prove that the defendant has bad character and for this reason was likely to commit the offense for which he is indicted. In other words, you should consider this evidence only for the specific limited purpose I have described. To consider this evidence for any other purpose would be improper.

The trial court's charge also contained language instructing the jury that the jury was not to consider evidence of any extraneous offenses—including S.Y.'s—unless they "find, beyond a reasonable doubt, that the defendant did, in fact, commit the offense." The jury was further instructed that it "may not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offenses."

---

[5]Appellant also admitted to minimized versions of his conduct with M.R.F. while talking with Ranger Burson. He admitted to going to buy a car with M.R.F., telling her that she should "wear short shorts when they go purchase a car so she could get a better deal" and touching her, which he stated that he had "confessed," but did not say to whom.

B. *Rule 404(b)*

1. *Standard of Review and Applicable Law*

Rule 404 of the Texas Rules of Evidence "regulates the admissibility of character conformity evidence—evidence of a person's character used to prove that he behaved in a particular way on a given occasion." *Bluntson*, 2025 WL 1322702, at *8 (first quoting TEX. R. EVID. 404(a)(1) (evidence of person's character "is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait"); and then quoting TEX. R. EVID. 404(b)(1) (Evidence of extraneous acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.")). Evidence that is solely used for the purpose of proving bad character is prohibited under Rule 404. *Id.* "In separating character conformity evidence from non-character evidence, Rule 404 incorporates the concept of relevance." *Id.* "Therefore, in the context of Rule 404, if character conformity evidence contributes even incrementally to a permissible non-character inference, Rule 404 does not bar its admission." *Id.*; *see* TEX. R. EVID. 404(b)(2) ("This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

Because "Rule 404(b) is a rule of inclusion rather than exclusion," the rule excludes "only that evidence that is offered (or will be used) *solely* for the purpose of proving bad character and hence conduct in conformity with that bad character." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (emphasis added) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). The exceptions listed in Rule 404(b) are neither mutually exclusive nor exhaustive. *Id.* For example, "evidence of other crimes or wrongs may be admissible if it tends to establish some elemental fact, such as identity, intent, or knowledge; tends to establish some evidentiary fact, such as motive, opportunity, plan, or preparation,

leading inferentially to an elemental fact; or rebuts a defensive theory." *Gonzalez v. State*, 541 S.W.3d 306, 310 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *Montgomery v. State*, 810 S.W.2d 372, 387–88 (Tex. Crim. App. 1990)). The issue of whether extraneous-offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court. *De La Paz*, 279 S.W.3d at 343. We must affirm the trial court's ruling if that ruling is within the zone of reasonable disagreement. *Montgomery*, 810 S.W.2d at 391. When the trial court determines that the evidence has independent relevance, the trial court may admit the evidence and, as here, instruct the jury that the evidence is limited to the specific purpose the proponent advocated. *Gonzalez*, 541 S.W.3d at 310.

### 2. *Analysis*

On appeal, Appellant maintains that while he "touch[ed] upon" PSEUJKR's reputation for dishonesty, his "primary defense at trial was physical impossibility." However, as noted above, Appellant's opening statements introduce the proposition that PSEUJKR was not credible, and that she was an untruthful complainant with a "history of making false allegations." Appellant even informed the jury that they would be hearing from PSEUJKR's father, who would testify that PSEUJKR "cannot be believed." PSEUJKR's alleged propensity for dishonesty was also emphasized throughout Appellant's cross-examination of the State's witnesses. Appellant specifically cross-examined Detective Shoemaker regarding his recorded interview with Appellant, wherein Appellant accused PSEUJKR of "lying" about the allegations and stated that she "has a history of lying." PSEUJKR was also repeatedly cross-examined about her previous allegations of sexual abuse involving her stepfather, which she later recanted, and a prior statement that she had made about her childhood: "I lied about pretty much everything." Appellant then elicited testimony from PSEUJKR's uncle, PSEUJKR's father, Appellant's sister, and Appellant's sister-in-law, about PSEUJKR's reputation for dishonesty. Appellant

11

also questioned several of his witnesses regarding his own reputation as a trustworthy individual with "good" character.

Under these facts, whether Appellant sexually abused other young women is "at least subject to reasonable disagreement whether the extraneous-offense evidence was admissible for the noncharacter-conformity purpose" of rebutting a defensive theory suggesting that (1) the complainant fabricated her allegations against him, and (2) Appellant would not or could not have engaged in the type of conduct alleged in the indictment. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008); *see also Dabney v. State*, 492 S.W.3d 309, 316–18 (Tex. Crim. App. 2016). Therefore, the trial court did not abuse its discretion in admitting this extraneous-offense evidence.

C. *Rule 403*

1. *Standard of Review and Applicable Law*

Rule 403 of the Texas Rules of Evidence "excludes otherwise relevant evidence when the costs of admission outweigh its utility." *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024). In accordance with the rule, "[t]he [trial] court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. Evidence is unfairly prejudicial when it has the undue tendency to suggest an improper basis for reaching a decision. *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000); *Render v. State*, 347 S.W.3d 905, 921 (Tex. App.—Eastland 2011, pet. ref'd). We utilize the *Montgomery* factors in our determination of whether evidence is admissible under Rule 403: "(1) the strength of the evidence's probative value, (2) the potential for the evidence to 'impress the jury in some irrational but nevertheless indelible way,' (3) [t]he amount of time required at trial to develop the evidence, and (4) the proponent's need for the

evidence." *Hart*, 688 S.W.3d at 891 (quoting *Montgomery*, 810 S.W.2d at 389–90). In any given case, "these factors may well blend together in practice." *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

Rule 403 does not require that the balancing test be performed on the record. *Greene v. State*, 287 S.W.3d 277, 284 (Tex. App.—Eastland 2009, pet. ref'd). In overruling a Rule 403 objection, the trial court is assumed to have applied a Rule 403 balancing test and determined that the evidence was admissible. *Id.* Moreover, the balancing of these factors "is always slanted toward admission, not exclusion, of otherwise relevant evidence." *Irsan v. State*, 708 S.W.3d 584, 616 (Tex. Crim. App. 2025) (quoting *De La Paz*, 279 S.W.3d at 343); *Luna v. State*, 687 S.W.3d 79, 98 (Tex. App.—Eastland 2024, pet. ref'd) ("Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial.").

### 2. *Analysis*

The first and fourth factors in the Rule 403 balancing test require that we identify the strength of the probative value and the State's need for the evidence, respectively. *See Hart*, 688 S.W.3d at 891. At the outset, we observe that apart from PSEUJKR, there were no witnesses to the sexual abuse alleged, and Appellant repeatedly suggested throughout trial that PSEUJKR had fabricated her allegations. *See Espinoza v. State*, No. 11-19-00232-CR, 2022 WL 3903774, at *9 (Tex. App.—Eastland Aug. 31, 2022, pet. ref'd) (mem. op., not designated for publication) (noting, in our analysis of the Rule 403 factors, that extraneous evidence can "serve[] to rebut the suggestion that [the complainant's] reports were contrived"). The extraneous-offense evidence that Appellant had previously sexually abused and inappropriately touched others therefore serves to establish his modus operandi and to "rebut the defense theories of lack of opportunity, impossibility, and inappropriate motive to testify." Further, the extraneous-offense evidence makes a fact of

consequence—that is, Appellant's manner, opportunity, and propensity to sexually abuse PSEUJKR—more likely. *See* TEX. R. EVID. 401(a); *Hart*, 688 S.W.3d at 893; *Wishert v. State*, 654 S.W.3d 317, 333 (Tex. App.—Eastland 2022, pet. ref'd) (noting that "[b]ecause the evidence of prior sexual abuse of children '[is] especially probative of [the defendant's] propensity to sexually assault children,' the Rule 403 balancing test normally will not favor the exclusion of evidence of the defendant's prior sexual assaults of children").

Although we acknowledge that the extraneous offenses were not committed in an identical fashion as the charged offenses, we have previously held that offenses "need not be completely identical to the charged offense in order to be probative," nor do the offenses need to have occurred recently. *See Jingbo Xu v. State*, No. 11-19-00203-CR, 2021 WL 1823228, at *7 (Tex. App.—Eastland May 6, 2021, pet. ref'd) (mem. op., not designated for publication); *see also Forrest v. State*, No. 11-21-00062-CR, 2023 WL 2316363, at *5–6 (Tex. App.—Eastland Mar. 2, 2023, pet. ref'd) (mem. op., not designated for publication) (overruling appellant's Rule 403 argument where one of the three extraneous-offense witnesses was not the same age as the complainant at the time the sexual abuse occurred); *Jimenez v. State*, No. 11-17-00065-CR, 2018 WL 3580879, at *3 (Tex. App.—Eastland July 26, 2018, no pet.) (mem. op., not designated for publication) ("The extraneous evidence, although remote, was probative due to its similarity to the charged offense."). Here, in every instance, Appellant targeted individuals with whom he shared a church association, family relationship (direct or indirect), and/or while in a position of authority and trust. Some of the extraneous-offense witnesses were family members, including his niece, S.Y., and his then sisters-in-law, D.M. and T.D., while others, such as C.M., C.S., and M.R.F., became acquainted with Appellant through church—i.e., environments in which Appellant held positions of power, influence, or mentorship.

14

Second, with the exception of one incident testified to by S.Y., Appellant consistently isolated his victims prior to committing the sexual assaults or misconduct. This pattern was evident in multiple instances: C.M. was lured into a classroom; D.M. and M.R.F. were in a vehicle alone with Appellant; and S.Y., C.S., and T.D. were in a bedroom. Likewise, PSEUJKR's allegations involved circumstances in which she was separated from others and under Appellant's control.

Finally, he frequently used sexually explicit language during the sexual assaults, and it appears that the underlying motive for uniting all these incidents was Appellant's desire for nonconsensual sexual gratification. Appellant's conduct consistently demonstrated a sexual purpose. Thus, the testimony regarding the extraneous offenses provided relevant, probative evidence that Appellant's actions toward PSEUJKR were neither accidental nor fabricated, but rather were part of a longstanding pattern of sexually predatory behavior toward children and significantly younger females. *See Luna*, 687 S.W.3d at 103; *see also Boykin v. State*, No. 11-22-00126-CR, 2023 WL 5280804, at *8 (Tex. App.—Eastland Aug. 17, 2023, no pet.) (mem. op., not designated for publication) ("While the proffered evidence did not pertain to the children who were the victims of the charged offense . . . it speaks to [a]ppellant's desire to attain sexual gratification from minor children and assists in contextualizing [a]ppellant's conduct in this case."). Thus, these factors weigh in favor of admission.

Regarding the second factor, the phrase "unfair prejudice" in Rule 403 "refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Gigliobianco*, 210 S.W.3d at 641 (citing *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005)). We recognize that evidence of a sexual nature involving children or family members is inherently inflammatory and prejudicial. *See Montgomery*, 810 S.W.2d at 397; *Newton v. State*, 301 S.W.3d

15

315, 320 (Tex. App.—Waco 2009, pet. ref'd). However, the question remains whether it is *unfairly* prejudicial in this case. *See Wishert*, 654 S.W.3d at 334.

As we have discussed, while the objected-to extraneous offenses and acts occurred over a span of nearly four decades, and the victims' ages at the time of the abuse varied as did Appellant's selected method of access to each victim, there existed marked similarities between PSEUJKR's testimony and each of the extraneous-offense witnesses. Moreover, the trial court took measures to mitigate the potential improper influence of the challenged evidence. *Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd); *Newton*, 301 S.W.3d at 320. In this regard, the trial court instructed the jury that it was to consider evidence of the extraneous bad acts only for the limited purpose of determining whether the evidence tended to prove a common scheme or plan by Appellant. The trial court further instructed the jury that any extraneous act could be considered only if proved beyond a reasonable doubt. These instructions equipped the jury to properly weigh the extraneous-offense evidence and minimized the risk of the jury improperly relying on such evidence in reaching its verdict. *See Herrera v. State*, 676 S.W.3d 896, 909 (Tex. App.—Eastland 2023, no pet.). We presume that the jury followed the trial court's instructions in the charge. *See id.* (citing *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005)). This factor weighs in favor of admission, given the trial court's repeated instructions.

The third factor focuses on "how much trial time was dedicated to the development of the evidence such that its introduction caused undue delay." *Hart*, 688 S.W.3d at 893 (citing *Montgomery*, 810 S.W.2d at 389–90). For this factor, "the concern is the extent to which the jury is distracted from considering the charged offense." *Id.* Consequently, "the time needed to develop the character evidence necessarily includes any testimony introduced regarding the evidence, including cross-examination, redirect examination, and any rebuttal offered by the defense in

response to the evidence." *Id.* The substantial time needed to develop this objected-to testimony was not disproportionate; accounting for a little more than a day and a half of the nine-day trial. But the objected-to testimony was raised repeatedly throughout the State's closing argument. *See Inthalangsy v. State*, 634 S.W.3d 749, 759 (Tex. Crim. App. 2021) (reviewing the transcript of the State's closing argument in its Rule 403 analysis); *Price v. State*, No. 11-22-00195-CR, 2023 WL 6627127, at *5 (Tex. App.—Eastland Oct. 12, 2023, pet. ref'd) (mem. op., not designated for publication) (same). Balancing these considerations, this Rule 403 factor weighs against admission of the extraneous offenses.

"In reviewing a trial court's determination under Rule 403, a reviewing court is to reverse the trial court's judgment 'rarely and only after a clear abuse of discretion.'" *See Espinoza*, 2022 WL 3903774, at *8 (quoting *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999)). "It is only when there is a 'clear disparity' between the prejudice and the probative value of the offered evidence that Rule 403 envisions exclusion." *Boykin*, 2023 WL 5280804, at *8 (quoting *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009)). Cumulatively, no clear disparity exists here. Thus, the trial court did not abuse its discretion in admitting the extraneous-offense evidence.

We overrule Appellant's first issue.

### III. *Experts*

In Appellant's second and third issues, he argues that the trial court abused its discretion in determining that PSEUJKR's therapist was qualified as a trauma expert and the Special Victims Unit detective was qualified as a delayed outcry expert.

#### A. *Standard of Review & Applicable Law*

An expert witness that is qualified as such by "knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of

fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. Before expert testimony can be admitted, three requirements must be met: "(1) [t]he witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (quoting *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006)). "These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance." *Id.*

"The specialized knowledge that qualifies a witness to offer an expert opinion may be derived from specialized education, practical experience, a study of technical works or a combination of these things." *Id.* To determine whether a trial court has abused its discretion in ruling on an expert's qualifications, an appellate court may consider: (1) whether the field of expertise is complex; (2) whether the expert's opinion is conclusive; and (3) whether the area of expertise is central to the resolution of the lawsuit. *Id.* 669–70 (citing *Rodgers v. State*, 205 S.W.3d 525, 528 (Tex. Crim. App. 2006)).

The reliability determination is likewise flexible and determined by the trial court in its function as the gatekeeper. *Luna*, 687 S.W.3d at 95 (citing *Wells v. State*, 611 S.W.3d 396, 426 (Tex. Crim. App. 2020)). Relevant here, "*Nenno* set forth a framework for evaluating the reliability of expert testimony in fields of study outside the hard sciences." *Rhomer*, 569 S.W.3d at 671; *see Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). When assessing expert testimony in the "soft science" fields of behavior and psychology, courts rely on the following factors to evaluate the reliability of such testimony: "(1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the

18

scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *Luna*, 687 S.W.3d at 95–96 (quoting *Nenno*, 970 S.W.2d at 561).

A trial court's admission of expert testimony will rarely be disturbed on appeal because "the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Rodgers*, 205 S.W.3d at 527–28 & n.9.

### 1. *Anne Ehrhart*

Before Anne Ehrhart, PSEUJKR's therapist, testified at trial, the trial court held a Rule 702 hearing outside the presence of the jury. *See* TEX. R. EVID. 702, 705(b). Ehrhart outlined her educational background and training. Ehrhart testified that she is a licensed professional counselor and a licensed professional counselor supervisor in Texas, has a bachelor's degree in psychology, and has a master's degree in marriage and family therapy. Ehrhart testified she has been licensed since 2006, and as part of her licensure requirements, she takes between twenty-four to thirty hours of continuing education classes every two years. Ehrhart described certain types of behavior and characteristics of persons, including children, that have experienced trauma, and "symptoms . . . or signs" that a person has post-traumatic stress disorder.

Ehrhart also has held a certification in Eye Movement Desensitization and Reprocessing (EMDR) therapy since 2016. Ehrhart explained that EMDR therapy is a modality for trauma treatment, and she began working towards this certification in 2010. She affirmed that she specializes in treating adults that have suffered childhood trauma. Ehrhart further testified that she has given seven to ten EMDR presentations throughout her career, and PSEUJKR sought her counseling services

19

after observing one of those presentations. She has had around 230 sessions with PSEUJKR over the years.

On cross-examination, Ehrhart clarified that she is not a researcher, but rather, a clinician, and explained the effects of EMDR on the brain:

> EMDR is based on the adaptive information processing model. This is all from Francine Shapiro's work. And, basically, it says, when you experience an event, your brain -- everyone's brain has a way of digesting the experience, making sense of it, taking what's important, storing it for future use. It's biology. It's survival. It's how we adapt to the world we live in. And it keeps what's important, sloughs off things that are not, because the brain can't possibly keep everything that happens.
>
> The brain does privilege negative experiences, because it's a biological survival mechanism. We need to know things that have hurt us or are disadvantageous to us so that we can try to survive. So it might slough off positive experience.
>
> So the brain has a negativity bias. So it holds on, kind of like Velcro, to a negative experience. It sloughs off, kind of like Teflon, some positive ones. So in -- in a trauma event, the process is interrupted, and so the memory is not getting stored.
>
> I mean, there -- there are aspects of the memory, but it's not necessarily fully digested and processed by the brain, by the nervous system, and so that is why a person is symptomatic with PTSD symptoms. It's a raw memory still. It has not turned into a narrative memory.
>
> A narrative memory is where something happens to you, let's say something neutral, and you can talk about it with people, and it's no big deal, or let's say it was a trauma memory, but you did work on it, and it integrated appropriately into your system, and that has become a narrative memory. So when you talk about it, your nervous system doesn't get hijacked. You're not emotional. You're not irritable. You're telling it more like a story.

Ehrhart also listed the training she had attended and named the various researchers who's work she had studied and titles of books she had read on the topic of trauma.

At the conclusion of the hearing, the trial court overruled Appellant's objections and allowed the State to present Ehrhart's testimony.

Appellant does not argue that behavior of trauma victims is an illegitimate field of expertise. *See, e.g.*, *Cohn v. State*, 849 S.W.2d 817, 818 (Tex. Crim. App. 1993) (recognizing research concerning the behavioral characteristics of sexually abused children as a legitimate field of expertise). Thus, the only questions that remain are whether Ehrhart was qualified to speak about trauma within the scope of her field and whether Ehrhart sufficiently showed that her testimony properly relied upon that field's principles. *See* TEX. R. EVID. 703; *Nenno*, 970 S.W.2d at 561.

With respect to the first question, Appellant specifically takes issue with Ehrhart's lack of a doctoral degree, arguing that Ehrhart was without the requisite qualifications to discuss trauma because she did not possess a medical degree or PhD on the subject. However, a doctoral degree, though beneficial, has never been a prerequisite for expert qualification designations. *See Rodgers*, 205 S.W.3d at 527–28 ("Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case."); *see also Brown v. State*, No. 02-19-00238-CR, 2020 WL 6929846, at *3 (Tex. App.—Fort Worth Nov. 25, 2020, no pet.) (mem. op., not designated for publication) ("As one of our sister courts has explained, with regard to qualifications, there is no litmus test, no particular license or degree that an expert must possess to qualify."); *see, e.g.*, *Gutierrez v. State*, No. 02-17-00415-CR, 2019 WL 1388748, at *2 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (mem. op., not designated for publication) (concluding that a clinical therapist with a master's degree in social work, who has worked at the Tarrant County Women's Center for approximately eight years, was qualified to testify about trauma behavior, trauma memory, and how the complainant's conduct was consistent with that of trauma victims); *Cottrell v. State*,

21

No. 11-08-00285-CR, 2010 WL 2862610, at *3 (Tex. App.—Eastland July 22, 2010, no pet.) (mem. op., not designated for publication) (concluding that a licensed professional counselor with only a master's degree, who was employed at the Children's Rape Crisis and Children's Advocacy Center for over five years, and who has counseled hundreds of people possessed sufficient qualifications to testify as an expert on the effects that sexual abuse could have on child victims).

Similarly unavailing are Appellant's arguments that Ehrhart's testimony was not reliable because she "could not provide specific details or scientific support, instead relying on vague references to a 'body of research.'" An expert is not required to list every study they relied upon; it is enough that Ehrhart articulated that her opinions were based on her experiences and training, and she was able to articulate specific publications and researchers in the forefront of her profession from which she had learned. *See Nenno*, 970 S.W.2d at 561; *see also, e.g.*, *Gutierrez*, 2019 WL 1388748, at *2 (concluding it was sufficient to show there was a reliable basis for an expert's opinion where the expert "testified that her testimony was based upon her experiences as a licensed clinical social worker at the Tarrant County Women's Center where she teaches trauma-related classes and exclusively counsels crime victims" and "[h]er opinions also were based on the Diagnostic and Statistical Manual of Clinical Disorders and on 'numerous medical studies'").

Lastly, embedded within this challenge to Ehrhart's expert witness designation, Appellant argues that Ehrhart's testimony only served to bolster PSEUJKR's credibility. "Bolstering," as defined by the Court of Criminal Appeals, is evidence offered for the *sole* purpose of "convinc[ing] the factfinder that a particular witness or source of evidence is worthy of credit, without substantively contributing 'to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.'" *Luna*, 687 S.W.3d at 100 (quoting *Rivas v. State*, 275 S.W.3d 880, 886

22

(Tex. Crim. App. 2009)). However, the "bolstering" complaint is misplaced in these determinations. *Id.* "Rather, 'the key to admissibility remains the same [in] these cases: the expert witness must be qualified in their field, use tools and methods from their field, draw conclusions based on those qualifications and methods, and not comment on victim credibility.'" *Id.* (quoting *Moreno v. State*, 619 S.W.3d 754, 762 (Tex. App.—San Antonio 2020, no pet.). In this regard, an expert's testimony that meets the other criteria and does not directly comment on witness credibility is unlikely to meet the threshold for undue prejudice, even if it may corroborate the victim's testimony and weigh against the defendant. *Id.*; *Price v. State*, 923 S.W.2d 214, 216–17 (Tex. App.—Eastland 1996, pet. ref'd).

Appellant's brief references two instances of "bolstering":

> [EHRHART:] She seemed to me to be trying to go back to the event and trying to stay here to listen to the question, and maybe at times not hearing the question or asking for it to be repeated, and she seemed like she was reliving parts of it while trying to stay present, and she looked to me at times zoned.
>
> . . . .
>
> [THE STATE:] And I want to just step back real quick to when [PSEUJKR] is testifying and you're saying you observed some dissociation. Would you say that this was a safe environment for her to retell the events of her trauma?
>
> [EHRHART:] No.
>
> [APPELLANT:] Object to speculation, Your Honor.
>
> THE COURT: Overruled.
>
> [EHRHART:] No.
>
> [THE STATE:] And why not?
>
> [EHRHART:] Because [Appellant] is in the room.

However, as the State points out, Ehrhart specifically maintained that she was *not* testifying as to the truthfulness of PSEUJKR's allegations and Ehrhart acquiesced

23

that there could be other reasons for PSEUJKR's "zoned" appearance at trial. Thus, we find no merit in Appellant's "bolstering" complaint. *See Chavez v. State*, 324 S.W.3d 785, 789 (Tex. App.—Eastland 2010, no pet.) (finding no abuse of discretion where the expert did not offer a direct opinion that the complainant was truthful in her initial outcry of sexual abuse or that the complainant belonged to a class of persons that was truthful or worthy of belief); *Davis v. State*, No. 11-14-00177-CR, 2016 WL 3382539, at *2 (Tex. App.—Eastland June 16, 2016, no pet.) (mem. op., not designated for publication) ("Although the jury could have applied Hallas's testimony to the complainant's outcry statement in its determination of whether to believe the complainant, Hallas did not directly testify that, in his opinion, the complainant was truthful."); *see also Jernigan v. State*, No. 11-07-00028-CR, 2008 WL 3845457, at *2 (Tex. App.—Eastland Aug. 14, 2008, no pet.) (mem. op., not designated for publication) ("Expert testimony, by nature, may tend to show whether another is telling the truth. This alone will not render that testimony inadmissible."). Accordingly, we conclude the trial court did not abuse its discretion in allowing Ehrhart to testify as an expert witness. *See Rodgers*, 205 S.W.3d at 527–28. We overrule Appellant's second issue.

### 2. *Detective Frank Shoemaker*

Special Victims Unit Detective Shoemaker estimated at trial that he has worked with "around 2000 cases" involving child abuse in his thirteen-year period as a detective in the Special Victims Unit, and that he attends training every two years as part of his licensure requirements. Appellant objected and requested a hearing outside of the jury's presence when the State inquired as to whether, through Detective Shoemaker's training and experience, he would be familiar with reasons why a victim may make a delayed outcry.

On voir dire examination, Detective Shoemaker explained that delayed outcries were common in his experience and training, and that the reasons why

24

children do not immediately outcry varied but included being afraid of the offender or fearing that they would be disbelieved. Detective Shoemaker denied relying on any articles to give his opinion and could not recall precisely why PSEUJKR stated that she had delayed reporting the abuse. Appellant's objections to Detective Shoemaker as an expert witness were overruled.

We address Appellant's contention that Detective Shoemaker was not qualified to testify as an expert in conjunction with Appellant's claim that Detective Shoemaker's testimony was unreliable and not relevant. The record shows that Detective Shoemaker's specialized knowledge was derived from his training and practical experience having specifically handled "around 2000 cases of child abuse" over his more than decade-long tenure as a detective. *See Rhomer*, 569 S.W.3d at 669 (providing that specialized knowledge that qualifies witness to offer expert opinion may be derived from specialized education, practical experience, study of technical works, or combination of these things). Although Appellant cites to several cases where a detective was deemed not to be an expert in a specific field, none of these cases involved the designation of a detective as an expert in delayed outcries, which at least one of our sister courts has held to be permissible. *See, e.g.*, *Bellard v. State*, No. 05-21-00633-CR, 2023 WL 1097769, at *5 (Tex. App.—Dallas Jan. 30, 2023, pet. ref'd) (mem. op., not designated for publication) (concluding detective was qualified to testify as an expert on delayed outcries); *Pinales v. State*, No. 05-01-00765-CR, 2002 WL 77256, at *4 (Tex. App.—Dallas Jan. 22, 2002, no pet.) (mem. op., not designated for publication) (same); *cf. Cox v. State*, No. 11-22-00188-CR, 2024 WL 1098830, at *10–11 (Tex. App.—Eastland March 14, 2024, no pet.) (mem. op., not designated for publication) (police chief who provided expert testimony regarding victims underreporting sex crimes was qualified by experience and training including the investigation of at least two hundred abuse cases). Moreover, Detective Shoemaker's background *was* tailored to the area of expertise

covered by his intended testimony, i.e., child abuse investigations and the types of issues that are commonly seen in those types of investigations. *See Rhomer*, 569 S.W.3d at 669.

Next, Appellant challenges the relevancy of Detective Shoemaker's testimony. To be relevant, expert testimony must relate to the pertinent facts of the case. *Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000). A material issue for the jury's determination was whether PSEUJKR was sexually abused. Because the jury's determination of this issue could have been affected by several factors, including the existence of a delayed outcry, the trial court could have reasonably concluded that Detective Shoemaker's testimony regarding outcries in general—irrespective of whether he had obtained PSEUJKR's reason for a delayed outcry—was relevant to the jury's assessment of whether she was, in fact, sexually abused by Appellant. *Netterville v. State*, No. 07-23-00448-CR, 2024 WL 5195296, at *1 (Tex. App.—Amarillo Dec. 20, 2024, pet. ref'd) (mem. op., not designated for publication) (concluding expert testimony about how children may act following sexual assault, variations in the outcry process, and protocols for treatment was relevant and admissible); *Brucia v. State*, No. 05-11-00866-CR, 2012 WL 2926203, at *6 (Tex. App.—Dallas July 19, 2012, pet. ref'd) (not designated for publication) (concluding the same where expert testified "mostly in generalities about how sexually abused children behave"); *Bickems v. State*, No. 05-01-01167-CR, 2002 WL 1741684, at *2 (Tex. App.—Dallas July 29, 2002, pet. ref'd) (not designated for publication) (concluding expert testimony about "the dynamics of sexual abuse, delayed outcry, and the process of disclosure" was relevant to assist the jurors in understanding why a child such as the victim would not initially report sexual abuse).

Additionally, courts have repeatedly held that such expert testimony is relevant in cases involving child abuse where, as here, the victim's credibility was at issue. *See Vasquez v. State*, 819 S.W.2d 932, 935 (Tex. App.—Corpus Christi–

26

Edinburg 1991, pet. ref'd) (concluding expert's testimony regarding symptoms of child abuse victims in general, including frequent existence of delayed outcry, was relevant in trial for aggravated sexual assault of a child where credibility was at issue); *Fletcher v. State*, No. 08-09-00122-CR, 2010 WL 3783946, at *5 (Tex. App.—El Paso Sept. 29, 2010, pet. ref'd) (not designated for publication) (concluding that "expert testimony regarding patterns of disclosure was relevant to explain the various reasons why children delay making a report of sexual abuse"). We conclude that it was not an abuse of discretion for the trial court to allow Detective Shoemaker to testify as an expert witness on delayed outcries. *See Rodgers*, 205 S.W.3d at 527–28. We overrule Appellant's third issue.

## IV. *Evidence of a Previous Grand Jury's No-Bill*

In Appellant's fourth issue, he argues that the trial court violated his constitutional rights by excluding evidence that a grand jury had no-billed the same accusations in 2012.

### A. *Relevant Background*

As previously discussed, PSEUJKR contacted law enforcement in 2012 to report Appellant's sexual abuse against her. Following an investigation by Detective Shoemaker, the case was presented to a grand jury, and the charges were no-billed. Ranger Burson reopened the investigation after allegations arose involving other complainants.

During trial, the State played a recording of Appellant's interview with Detective Shoemaker in 2012, and Appellant took issue with the following exchange that occurred at the end of the interview:

> [DETECTIVE SHOEMAKER:] I take the information, okay? And what I have found is that if things seem to make sense, okay? If I'm getting told by several people that everything is pointing in one direction, okay, more than likely it's the truth or at least partial of the truth.

[APPELLANT:] Yeah, well, there's no truth to me doing something to [PSEUJKR] so that's not the right direction.

[DETECTIVE SHOEMAKER:] Okay, well, all I'm saying is I take the information, and I send that to the district attorney, and he takes a look at it and says, 'Well, we do have enough—yeah, a crime appears like a crime has been committed.' Okay? So then the district attorney will take it to the grand jury—

[APPELLANT:] Right.

[DETECTIVE SHOEMAKER:] —And the grand jury is going to decide, "Yes, we need to try this person" or "No, we better not. There's not enough evidence, or that'd be a hard one to prove," something like that.

Appellant argued that, by the admission of this evidence, the State had created a false impression that a grand jury had true-billed the case, opening the door to evidence of the 2012 grand jury's no-bill. The trial court overruled Appellant's request to develop evidence relating to the grand jury's no-bill.

B. *Applicable Law*

"A grand jury has the duty to determine whether evidence exists to formally charge a person with an offense." *Harris v. State*, 572 S.W.3d 325, 335 (Tex. App.—Austin 2019, no pet.) (citing *Rachal v. State*, 917 S.W.2d 799, 807 (Tex. Crim. App. 1996)); *see* TEX. CODE CRIM. PROC. ANN. art. 20A.051 (West 2022). "A no-bill from a grand jury is merely a finding that the specific evidence brought before that particular grand jury did not convince them to formally charge the accused with the offense alleged." *Id.* (first citing *Rachal*, 917 S.W.2d at 807; and then citing *Elam v. State*, 47 S.W.2d 279, 279–80 (Tex. Crim. App. 1932) (admission of no-bill for a prior altercation between the victim and the defendant improperly presented the jury with the grand jury's opinion as to the merits of disputed issues)).

Significantly, the Texas Court of Criminal Appeals has held that "[a] prior 'no bill' by the grand jury is not material in any way to the defense of a case." *Smith v.*

*State*, 474 S.W.2d 486, 489 (Tex. Crim. App. 1971). In 2020, this court applied *Smith* in a revocation proceeding and held that, because "a prior no-bill for the charged offense is not material in any way to the defense of a case . . . evidence of a grand jury's once having no-billed the charged offense was properly excluded." *Dickerson v. State*, No. 11-18-00268-CR, 2020 WL 6373274, at *2 (Tex. App.—Eastland Oct. 30, 2020, no pet.) (mem. op., not designated for publication). We reasoned that a grand jury's "return of a no-bill has no evidentiary value because there is no way to determine what specific evidence was brought before the grand jury." *Id.*

Our sister courts have applied *Smith* in similar circumstances, holding that a trial court does not abuse its discretion in excluding a grand jury's prior no-bill. *See, e.g., Perry v. State*, No. 06-06-00163-CR, 2007 WL 845560, at *2 (Tex. App.—Texarkana Mar. 21, 2007, no pet.) (mem. op., not designated for publication); *cf. Meeks v. State*, No. 03-03-00509-CR, 2005 WL 1489593, at *5 (Tex. App.—Austin June 23, 2005, no pet.) (mem. op., not designated for publication) ("Evidence of a prior 'no-bill' does not address the issue of guilt, and was properly excluded because it was not material in any way to the defense of the case.").

C. *Analysis*

On appeal, Appellant contends that the "trial court's erroneous exclusion of relevant evidence rose to the level of a constitutional violation by precluding the defense from presenting a defense." Appellant further argues that the State had created a false impression for the jury that "concealed the fact that a previous grand jury had already determined [PSEUJKR's] allegations did not warrant a trial." Appellant's brief includes no mention of cases concerning the exclusion of no-bill evidence.

It is unclear how Appellant can prevail in his argument that the trial court's exclusion of evidence of a prior no-bill rose to the level of a constitutional violation

and was necessary for his defense given the holding in *Smith*. *Smith*, 474 S.W.2d at 489; *see Shumake v. State*, 502 S.W.2d 758, 760 (Tex. Crim. App. 1973). We further disagree that the aforementioned exchange opened the door[6] to the admission of this evidence when, at the time of Detective Shoemaker's statements, the case had yet to be presented to the grand jury and Detective Shoemaker was, at most, describing what the next steps and the possible outcomes could be. The trial court did not abuse its discretion in excluding evidence of the no-bill. *See Smith*, 474 S.W.2d at 489. We overrule Appellant's fourth issue.

## V. *Punishment Evidence*

Appellant argues in his fifth issue that the trial court erred by excluding evidence discovered during the punishment phase.

### A. *Relevant Background*

During a break in the punishment phase, Appellant's trial counsel informed the trial court that he had been contacted by a family member with new impeachment evidence. Trial counsel stated that Dinsel Evans, Appellant's uncle, told him that in 2012, shortly after Appellant had been arrested, Dinsel confronted PSEUJKR and asked, "Why are you doing this to [Appellant]? He did not do anything to you." Dinsel told counsel that PSEUJKR replied, "I am going to make him pay for what he has done to my mother," and PSEUJKR "did not respond in any way to his assertion that [Appellant] had not done anything to her." Counsel sought to introduce this evidence during punishment, arguing that this evidence was relevant as it "shows a lack of impact on the alleged victim in this case." The State countered that this evidence was a "collateral attack on what the jury has already decided," the guilt of Appellant, and that such evidence might be an appropriate basis for a motion for new trial—but not punishment. Dinsel was not present to testify during the

---

[6]We note that Appellant, in his opening statement, told the jury that a grand jury had previously no-billed allegations against him by the complainant.

hearing, and no affidavit or other proffer was admitted in lieu of his testimony. The trial court excluded the evidence.

B. *Standard of Review & Applicable Law*

The trial court has wide discretion to determine the admissibility of evidence at the punishment phase. *Trejo v. State*, 683 S.W.3d 815, 819 (Tex. App.—San Antonio 2023, no pet.); *Lopez v. State*, No. 11-23-00251-CR, 2025 WL 920046, at *2 (Tex. App.—Eastland Mar. 27, 2025, pet. ref'd) (mem. op., not designated for publication). The Texas Code of Criminal Procedure governs the admissibility of evidence during the punishment stage of a non-capital criminal trial. CRIM. PROC. art. 37.07 § 3(a)(1) (West Supp. 2024). Article 37.07 authorizes the trial court to admit evidence during the punishment phase "as to any matter the court deems relevant to sentencing." *Id.* The Court of Criminal Appeals has held that generally, "evidence is 'relevant to sentencing,' within the meaning of the statute, if it is 'helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case.'" *Beham v. State*, 559 S.W.3d 474, 479 (Tex. Crim. App. 2018) (quoting *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007)). Significant here, "at the punishment stage of a criminal trial, evidence is not admissible for the purpose of relitigating the defendant's guilt." *McGee*, 233 S.W.3d at 318.

C. *Analysis*

Appellant specifically argues that Dinsel's testimony was "probative for reasons outside of relitigating guilt/innocence because it directly rebutted the testimony of [PSEUJKR] and her personal counselor who testified as an expert that [PSEUJKR] had in fact been victimized," and by excluding this evidence, the trial court violated his right to "compulsory process" of witnesses under the Sixth Amendment.

Although Appellant argues that this testimony was probative outside of relitigating guilt/innocence, his stated reason for its admission goes to a question of

Appellant's guilt—i.e., whether "[PSEUJKR] had in fact been victimized"—such evidence is improper in the punishment phase. *See McGee*, 233 S.W.3d at 318; *see, also e.g.*, *Alvarez-Rodriguez v. State*, 678 S.W.3d 317, 323 (Tex. App.— San Antonio 2023, no pet.) (rejecting the appellant's argument that the "testimony of the complainant concerning his feelings toward the sexual assault for which [a]ppellant was convicted was clearly relevant to [a]ppellant's punishment" because a reiteration of an alleged recantation "would not have assisted the jury in determining an appropriate sentence"). Accordingly, the trial court acted within its discretion in excluding this evidence. *See Baird v. State*, 379 S.W.3d 353, 359 (Tex. App.—Waco 2012), *aff'd*, 398 S.W.3d 220 (Tex. Crim. App. 2013) ("Section 3(a) of Article 37.07 of the Code of Criminal Procedure grants trial courts broad discretion to admit evidence during the punishment phase."). We conclude that the trial court did not abuse its discretion in excluding such evidence. We overrule Appellant's fifth issue.

## VI. *Motion for New Trial*

In his sixth issue, Appellant argues that the trial court abused its discretion in denying Appellant's motion for new trial based on newly discovered evidence—the testimony provided by Dinsel at the hearing on the motion.

### A. *Relevant Background*

In a hearing on Appellant's motion for new trial, Dinsel testified that although he "[b]arely" recognized PSEUJKR's name, "[doesn't] know her very well," and had only seen her "but two or three times" in his life, he had heard about allegations involving Appellant "[t]hrough the grapevine." Dinsel, however, denied knowing about any allegations involving Appellant *and* PSEUJKR:

> I don't know of any of the allegations, probably what this case is about.
> . . . But I've known [PSEUJKR's] mother, and -- and I've heard a few
> things there. And that's what -- I thought I heard from her that that's

what this case is about. I don't even know really what this case is about, to tell you the truth.

Dinsel said the "one time" he spoke with PSEUJKR was after church approximately ten years prior, when PSEUJKR was college aged. Dinsel initially could not recall "how . . . [Appellant's] name c[a]me up" or what he said to prompt PSEUJKR's response, but testified:

> [PSEUJKR] said something like, "[Appellant] is going to end up having to pay for what he's done to his [sic] mother." And that's all she said. She got -- I'll put it this way. She got pissed because I -- I said that to her, and she cut it off. That's the way it was. And that's all I've got to say.

Dinsel then clarified that he had heard that PSEUJKR had been "harassing" Appellant for reasons unknown, which is what prompted him to tell PSEUJKR, "It's time for you to leave him alone." Dinsel explained that he was "just trying to tell [the trial court] to the best of [his] knowledge." The trial court denied Appellant's motion for new trial.

B. *Standard of Review & Applicable Law*

"We review a trial court's denial of a motion for new trial under an abuse of discretion standard." *Gonzales v. State*, 680 S.W.3d 358, 394 (Tex. App.—Eastland 2023, pet. ref'd) (quoting *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012)). We do not substitute our judgment for the trial court's judgment but, instead, determine whether the trial court's decision was arbitrary or unreasonable. *Id.*; *see Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). We view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made were made. *State v. Thomas*, 428 S.W.3d 99, 104 (Tex. Crim. App. 2014). When denying a motion for a new trial, a trial court abuses its discretion only if no reasonable view of the record could support the ruling. *Id.*

The Code of Criminal Procedure gives an accused a right to a new trial "where material evidence favorable to the accused has been discovered since trial." *See* CRIM. PROC. art. 40.001 (West 2018). To meet the statutory requirement for materiality, a defendant must satisfy the following four-part test: (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of his trial; (2) the defendant's failure to discover or obtain the evidence was not due to a lack of diligence; (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in another trial. *State v. Arizmendi*, 519 S.W.3d 143, 149 (Tex. Crim. App. 2017) (citing *Carsner v. State*, 444 S.W.3d 1, 2–3 (Tex. Crim. App. 2014)); *see also Pinson v. State*, No. 11-17-00003-CR, 2018 WL 6722294, at *6–7 (Tex. App.—Eastland Dec. 21, 2018, pet. ref'd) (mem. op., not designated for publication) (applying *Carsner* factors). The failure to establish any of the requirements for a new trial based on newly discovered evidence warrants the trial court's denial of the motion. *Jones v. State*, 234 S.W.3d 151, 157 (Tex. App.—San Antonio 2007, no pet.); *Pinson*, 2018 WL 6722294, at *6; *Perez v. State*, No. 11-11-00247-CR, 2013 WL 5512834, at *10 (Tex. App.—Eastland Sept. 30, 2013, pet. ref'd) (mem. op., not designated for publication) ("If an appellant fails to establish any one of these prongs, he fails to establish an abuse of discretion by the trial court in denying the motion for new trial.").

C. *Analysis*

We only address the third and fourth prongs of the *Carsner* test as they are dispositive. In Appellant's motion for new trial, Appellant argued as he now does on appeal: this newly discovered evidence is impeachment evidence and bears directly upon the credibility of PSEUJKR's testimony, which was of significant importance at trial. However, Dinsel did not state that PSEUJKR had in any way recanted her allegations against Appellant; Dinsel explained that he was unaware of

what the allegations between PSEUJKR and Appellant entailed.  Therefore, at most, Dinsel's testimony established that PSEUJKR wanted Appellant to be held accountable for sexually abusing her mother.[7]

Even accepting Dinsel's statements as credible and accepting his cautions that he was doing his best to remember the conversation, PSEUJKR's expressed desire that Appellant "pay for what he did" to her mother does not establish that she fabricated her allegations against him.  And Dinsel did not testify to any such implication.  *See Sanchez v. State*, No. 11-05-00043-CR, 2006 WL 998181, at *6 (Tex. App.—Eastland Apr. 13, 2006, pet. ref'd) (mem. op., not designated for publication) ("If the newly discovered evidence is of questionable weight and credibility and would probably not bring about a different result upon a new trial, the trial court does not abuse its discretion in refusing a new trial.").  Thus, the trial court could have reasonably concluded that the testimony was not of such weight that it would probably bring about a different result in a new trial.  *See Arizmendi*, 519 S.W.3d at 149; *Brown v. State*, No. 11-03-00137-CR, 2004 WL 1403807, at *4 (Tex. App.—Eastland June 24, 2004, pet. ref'd) (not designated for publication).  Accordingly, we conclude that the trial court did not abuse its discretion when it denied Appellant's motion for new trial based on Dinsel's testimony.  We overrule Appellant's sixth issue.

## VII. *The Trial Court's Judgments of Acquittal by Jury in Counts Eight and Ten*

We note that the record contains error that requires us to vacate two of the trial court's judgments of acquittal.  As discussed above, the State waived Counts Eight and Ten before the jury was empaneled and sworn.  The State informed the trial court that it was "able to pinpoint the alleged acts that were in Count [Eight] and Count [Ten]" during a pretrial interview with PSEUJKR, which indicated that

---

[7]PSEUJKR testified that she was aware that her mother had been sexually abused by Appellant, but there was no testimony elicited from PSEUJKR at trial regarding the effect of this knowledge on her.

the offenses occurred when PSEUJKR was seventeen years old. The State notified the trial court that Counts Eight and Ten would be waived on that basis, and the trial court confirmed that it understood that "[t]he State's waiving Count [Eight] and Count [Ten]." The State did not file a motion to dismiss. *See* CRIM. PROC. art. 32.02 (West 2006). Instead, the trial court signed a "Judgment of Acquittal by Jury" for each count.

Because the jury did not acquit Appellant of these two counts, and because the State waived these counts given PSEUJKR's age at the time of the offenses,[8] we must vacate the trial court's judgments of acquittal by jury in Counts Eight and Ten and dismiss those counts. TEX. R. APP. P. 43.2(e); *see Hughitt v. State*, 539 S.W.3d 531, 537 (Tex. App.—Eastland 2018), *aff'd*, 583 S.W.3d 623 (Tex. Crim. App. 2019).

## VIII. *This Court's Ruling*

We vacate the trial court's judgments of acquittal for Count Eight and Count Ten, and those counts are dismissed. We affirm the judgments of the trial court for the remaining counts.

W. BRUCE WILLIAMS
JUSTICE

November 14, 2025

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

---

[8]We assume without deciding that the statute of limitations for the offenses charged in each count, if committed against an adult, would have expired prior to the State's indictment. *See* PENAL § 22.01(a)(3), (c), § 22.011(a)(1); CRIM. PROC. arts. 12.01(2)(E), 12.02(a)(2).